UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BERNARD D. ALSTON,

                        Petitioner,          **DECISION AND ORDER**
                                             **No. 02-CV-6179(VEB)**

        -vs-

EDWARD DONNELLY, Superintendent,

                        Respondent.
_____

## INTRODUCTION

Petitioner, Bernard D. Alston ("Alston"), filed this *pro se* petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court on one

count of first degree rape (N.Y. Penal Law § 130.35(1)). The parties have consented to

disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

By Monroe County Indictment No. 6457/98, Alston was charged with first degree

burglary and six sexual offenses (three counts of sodomy and three counts of first degree rape)

against Cassandra Dean ("Dean"). The charges stemmed from an incident that occurred at

Dean's house at 180 Webster Avenue on December 12, 1997. Count two charged sodomy under

N.Y. Penal Law § 130.50(1)–namely, that Alston engaged in "deviate sexual intercourse . . . by

forcible compulsion, to wit: contact between the mouth and the penis[.]" Respondent's Exhibit

("Resp't Ex.") E at 46. Both counts four and six also charged sodomy under N.Y. Penal Law

§130.50(1) but under a slightly different theory–namely, that Alston engaged in "deviate sexual

intercourse . . . by forcible compulsion, to wit: contact between the mouth and the anus[.]"

Resp't Ex. E at 47-48.  Counts three, five, and seven charged Alston with first degree rape pursuant to N.Y. Penal Law § 130.35(1) under the same theory–that he "engaged in sexual intercourse with Cassandra Lee Dean, by forcible compulsion." *Id.*

Alston's jury trial was held in Monroe County Court (Egan, J.) in February 1999. Alston testified at trial despite an adverse *Sandoval*[1] ruling that allowed the prosecutor to question him about a 1990 conviction for possessing a stolen credit card. Dean, the victim, testified to four separate, non-consensual, alternating acts sex–oral sodomy, sexual intercourse, anal sodomy, and sexual intercourse. Alston, on the other hand, testified that he had one act of consensual sexual intercourse with Dean that night.

Dean testified that on the night of December 11, 1997, she had been partying at her sister's house at 751 North Goodman Street and had consumed more than a six-pack of beer. T.182, 200-01.[2] According to Dean, she arrived home at approximately 4:30 a.m. in the morning of December 12th, at which point she laid down on the couch and watched television and dozed for a short time before hearing a knock on the door. T.184-86. The visitor was Norma Jean Colbert ("Colbert") who was a friend of Dean's. T.187.[3]

While they were chatting, Alston approached on his bicycle and greeted Colbert[4], who introduced him to Dean. Dean testified that she had never met Alston before. A few minutes later, Dean invited them both inside and they all chatted. T.191-92. After about thirty minutes,

---

[1]      *People v. Sandoval*, 34 N.Y.2d 371 (1974).

[2]      Citations to "T.___" refer to the trial transcript.

[3]      Colbert testified that she had arrived at Dean's house at about 1:15 a.m., followed shortly by Alston. According to Colbert, she and Alston left after about half an hour. T.374.

[4]      Alston knew Colbert because he had dated her mother, and from seeing her in the neighborhood.

Colbert announced that she was ready to go. However, Alston did not get up to leave until Dean

told him that he had to go, too. At that point, Colbert and Alston left. Dean locked the door and

returned to the couch. T.194-96.

A short time later, Dean heard another knock. She testified that as she unlocked the door,

the person outside pushed it open and forced his way inside the house. T.197. It was Alston,

brandishing a knife. According to Dean, she tried to fight him off with the cast that she had on

her right arm, but to no avail. Alston stated, "You are going to give me that pussy." T.198.

Alston snatched off her blouse, grabbed her by the hair, and dragged her into the spare bedroom.

T.200. Dean related that Alston slammed her down onto a floor vent, causing her mouth to start

bleeding. She said that Alston kissed her on the mouth and spat the blood out. T.203.

Dean testified that Alston "showed [her] the knife more" and told her to "get on [her]

knees[.]" T.204. He then placed his penis into her mouth for a "[n]ot even five seconds." *Id.*

Alston then announced, "[T]ake your clothes off, bitch. I want some pussy." *Id.* Dean took her

clothes off, and Alston then put his penis into her vagina, while "calling [her] names, whores and

bitches . . . and stuff like that." *Id.*  Alton then stated, "[T]urn your ass around," and he put "his

penis in [her] behind." T.205. Dean testified that his penis actually penetrated her anus and that

she was in pain. On cross-examination, when asked if there was any bleeding, Dean replied

affirmatively. T.302. Alston then removed his penis from her anus and put it back into her

vagina, saying "[F]uck me back, fuck me back." *Id.* At that point, Dean testified, Alston

ejaculated into her vagina, and laid on top of her for a few seconds. He then told her that she

"better not get up" or he "was going to kill [her]." Alston then ran out the door. T.206.[5] Dean

testified that the knife was not always displayed; that sometimes he put the knife into his pocket

and would threaten to take it back out by "doing [her] rough." *Id.*

As soon as Alston left, Dean ran to her sister's house where she called 911 at 5:45 a.m.

T.211-12. She was taken to the emergency room where she was treated, a rape kit was prepared,[6]

and she was then released. T.212. The physician's assistant testified that Dean was "emotionally

upset, tearful, but not hysterical" and that her behavior was consistent with that of other sexual

assault victims. T.316-17. The only sign of physical trauma was the lacerated lip; the physician's

assistant testified, however, that a report of a person being anally penetrated did not necessarily

yield any type of physical trauma. T.322.

Officer Koehn of the Rochester Police Department testified that when Alston voluntarily

waived his rights and gave the following written statement which was introduced into evidence

at trial:

> I, Bernard Alston, am twenty-nine years of age, and reside at 825 North Goodman
> Street. Officer Koehn has explained to me that I have the right to remain silent; I
> do not have to say anything if I do not want to; anything I say can be used against
> me in a court of law; I have a right to talk to a lawyer before I answer any
> questions and to have a lawyer with me during questioning, if I so desire; if I
> can't pay for a lawyer, one will be provided for me before any questioning, if I
> wish; and that if I do agree to talk about this matter without a lawyer present, I
> can stop talking at any time. I have read the statement of my rights or have had

---

[5]    To summarize, Dean testified as to four sexual acts committed by Alston: sodomy (oral sex),
followed by an act of vaginal intercourse, followed by anal intercourse, and concluding with vaginal intercourse. In
the grand jury, Dean evidently testified as to six sexual acts committed by Alston, since the indictment charged
Alston with three counts of sodomy and three counts of rape. Recognizing this disparity in proof, the trial court
dismissed count six (sodomy–anal intercourse) and count seven (rape–vaginal intercourse) at the close of the
prosecution's case.

[6]    The laboratory technician testified that he observed sperm cells on the vaginal slides prepared
during the Dean's examination at the hospital. T.307.  He did not testify that there were sperm cells on the anal
slides.

this entire statement read to me. I willingly make the following statement: About a week ago at night, I remember because it was night, I had two forty ounce beers and was drunk. I was also high on cocaine. Also, I had been with someone who gave me a hit of cocaine. I was walking, I remember it was Webster Avenue, and I ran into a girl I know named Norma [Colbert]. Me and Norma's mom used to work together. Me and Norma went into a house on Webster Avenue. It was a brown house. There was a girl there who I recognized from a while ago. I know she's a prostitute, and I think she cheated me once before. By that, I mean, that we had smoked some drugs together before with the idea that we would have sex, and after we smoked she would leave and not have sex. Me and Norma and this girl went to get drugs, and this girl said when we get back, we will do something. I understood her to mean that we were going to have sex. After we smoked, Norma left. Then this girl put me out of the house. By that, I mean, she started opening the door and asking me to leave. I thought, she ain't [*sic*] going to do this to me again. I left and walked a couple of blocks. Then I came back. This girl opened up the door and let me in. I went into the house and thought we'd have sex. I tried to talk her into it and thought if I got her into the position for it, she would want to. You could say that I forced her. I kind of pulled on her and tugged on her. I took off some of her clothes and she took off her pants. Then we had straight sex. Afterwards, I left. Officer Koehn told me that this girl's name was Cassandra Dean or Sandy. I did find out later, afterward, this girl's son was a guy I know named Lamont because I had an altercation over the incident. I know I shouldn't have forced Sandy to have sex, that it was dead ass wrong, but I was drunk and wasn't thinking clearly. My job is very important to me and I want to return to it. I am trying to get my life together and I need my job. My boss is counting on me to be to work. My kid is counting on me too. I'm sorry that this happened and like another chance to maybe get into another rehab program. I gave this statement to Officer Koehn. He didn't threaten me or make promises to me.

T.482.

Alston testified that on the night of the incident, he was walking down Webster Avenue when he saw Colbert, standing in the doorway of 180 Webster Avenue, talking to Dean. T.528. Alston said that he walked up to Colbert and asked her for a light, and that he was then invited into the house. Alston asked whether they "kn[e]w where any dope was[?]" Colbert responded affirmatively, and the three of them left to go purchase drugs. As they were walking, Alston asked Colbert if Dean was "dating," which is term used to "ask a prostitute . . . do you want to

have sex for money or so forth." T.529. Colbert replied affirmatively and said, "[W]e can go back to Sandy's house[.]" *Id.*

Alston purchased two dime bags of crack cocaine and then they all proceeded back to Dean's house. On the way, Alston asked Dean if she was "dating" and Dean replied equivocally, asking "Why?" T.530. Once back at the house, Alston took out a dime-bag and split it three ways; they all smoked, drank beer and talked. T.530-31. Alston testified that he had a conversation of a sexual nature with the women; Colbert told Dean that she should make sure to have Alston perform oral sex on her because he was good at it. T.531. Colbert then asked about the other dime-bag, and so Alston pulled it out and the three of them smoked it, too. T.532. After that, Colbert said that wanted to leave Dean and Alston alone. She then left Dean's house. *Id.*

Alston testified that at that point he was "kind of anxious about the sexual part" so he "eased over to" Dean and said, "[Y]ou ready; you ready." *Id.* Dean remarked about "how high she was, and she didn't want to do anything right now, and at [that] point, she did ask [him] to leave, so, [he] left." *Id.*

Alston testified that he stood in the middle of the street for a minute and was "kind of pissed off" about what Dean had done. He was standing with his hands in his pockets and he "came across the two empty bags" and decided he "was going to make some dummy bags" filled with something that looked like cocaine to "try to trick Sandy into, you know, sex." T.533. Alston related that he found some drywall, which he broke into pieces and put in the bags. He then returned to Dean's house and knocked on the door. When she answered, he asked if he could use her "stem." She said yes, and when she realized he had bought more crack, asked for a "hit." Alston said, "I don't know because, you know, you kind of dis-sed [*sic*] me the last time."

At that point, Dean said, "[W]ell, we can still do something" but she wanted a "hit" first. T.535.

Alston suggested having sex first, so she would not be too high, and Dean agreed. They

proceeded to the spare bedroom where they had consensual sex; Alston stated on cross-

examination that he could not remember whether he ejaculated. After they had sex, Alston gave

Dean the "dummy" bag. She became "pretty pissed off" and was calling him "M F this and M F

that, she'll kill [him]." T.536. Alston then left the house. He denied bringing a knife to Dean's

house. *Id.*

Alston testified that he voluntarily accompanied the police to the police station and

agreed to give a statement, after the police officers told him that they knew what kind of a person

Dean was and that they wanted to hear his side of the story. T.541. He testified that the phrase in

the statement about his getting Dean into a compromising position so that she would have sex

with him was suggested by the officers, and that he was "kind of reluctant about this force

thing."   T.544. On cross-examination, Alston stated that the officers never said anything to him

to the effect that if he gave a statement, they would let him go home. T.565. He testified that he

remembered making the remark, "[Y]ou could say that I forced her[.]" T.569. He admitted that

those were his words.

After the close of the prosecution's case, and before Alston testified, the trial court

dismissed count six (anal sodomy) and count seven (rape) due the prosecution's failure to

present proof as to these counts. (Dean only had testified to the burglary followed by  four sexual

acts, not six.) Counts one through five were submitted to the jury, which returned a verdict

acquitting Alston of the first four counts and convicting him on count five. He was sentenced as

a second felony offender to a determinate term of twenty-five years in prison followed by a five-

year period of post-release supervision.

Represented by new counsel, Alston appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. That court unanimously affirmed the conviction. *People v. Alston*, 275 A.D.2d 997, 714 N.Y.S.2d 252 (App. Div. 4th Dept. 2000). Leave to appeal to the New York Court of Appeals was denied. *People v. Alston*, 96 N.Y.2d 756, 748 N.E.2d 1078, 725 N.Y.S.2d 282 (N.Y. 2001). Alston filed a collateral motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 which was denied by the County Court (Marks, J.).

In his petition for federal habeas relief, Alston asserts the following grounds for relief: (1) his conviction violates the Double Jeopardy clause because it is impossible to determine which act of rape alleged in the indictment formed the basis of the jury's guilty verdict; (2) his conviction is not supported by sufficient evidence and is against the weight of the evidence; (3) the trial court erred in precluding defense counsel from commenting on the counts of the indictment that were dismissed prior to submission of the case to the jury; and (4) trial counsel was ineffective in failing to file an omnibus motion compelling the prosecution to particularize the indictment, failing to question the trial court as to why counts three, four and five were not dismissed, and failing to object to the jury's verdict. Respondent answered the petition and interposed the defenses of non-exhaustion and procedural default as to most of Alston's claims, as discussed *infra*.

For the reasons set forth below, the request for a writ of habeas corpus is denied, and the petition is dismissed.

**DISCUSSION**

**Exhaustion**

Before a federal court may consider an application for habeas corpus relief pursuant to

28 U.S.C. § 2254, the petitioner must have exhausted all the remedies available in the state

courts. *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 512, 30 L. Ed.2d 438 (1971); *Grey v.*

*Hoke*, 933 F.2d 117, 119-21 (2d Cir. 1991). This exhaustion requirement is codified under 28

U.S.C. § 2254(b)(1)(A) and extends to every federal claim asserted by a petitioner. *Caballero v.*

*Keane*, 42 F.3d 738, 740 (2d Cir. 1994). The exhaustion requirement prohibits the granting of an

application for a writ of habeas corpus unless the petitioner has exhausted the remedies available

in the courts of the state in which he or she was convicted, *see* 28 U.S.C § 2254(b)(1)(A),

although the federal courts now have the discretion to deny a petitioner's unexhausted claims,

*see* 28 U.S.C. § 2254(b). In particular, the exhaustion doctrine "requires . . . that state prisoners

give state courts a fair opportunity to act on their claims." *O'Sullivan v. Boerckel*, 526 U.S. 838,

844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) (citing 28 U.S.C. § 2254(c)) (additional citations

omitted). Thus, a petitioner is not deemed to have exhausted the available state remedies if he or

she has the right under state law to raise, by any procedure, the federal question presented in his

or her habeas petition. 28 U.S.C. § 2254(c). The Supreme Court has interpreted this as requiring

petitioners to invoke "one complete round of the State's established appellate review process,"

including an application to "a state court of last resort when that court has discretionary control

over its docket." *O'Sullivan*, 526 U.S. at 843, 845.

Furthermore, the exhaustion requirement is not satisfied until the petitioner has "fairly

presented" the federal claim to the highest court of the state. *See Picard*, 404 U.S. at 275 ("We

emphasize that [for purposes of exhaustion] the federal claim must be fairly presented to the state

courts."). A claim may be "fairly presented" to the state courts if "the legal basis of the claim made in state court was the 'substantial equivalent' of that of the habeas claim." *Daye v. Attorney General of State of N.Y.*, 696 F.2d 186, 192 (2d Cir. 1982) (quoting *Picard*, 404 U.S. at 278) (additional citations omitted). "This means, in essence, that in state court the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id.* Additionally, a habeas petitioner may "fairly present" his or her federal claims "even without citing chapter and verse of the Constitution," by the following four methods, first summarized by the Second Circuit in *Daye v. Attorney General of New York*:

(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, or (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation. *Daye*, 696 F.2d at 194.

Respondent notes that grounds one through three of Alston's habeas petition were raised in his appellate brief on direct appeal to the intermediate appellate court; however, Alston only sought leave to appeal to New York's highest appellate court with respect to the double jeopardy claim (ground one). Therefore, respondent argues, grounds two (sufficiency of the evidence/weight of the evidence) and three (trial court error) are unexhausted because Alston has not completed one full round of New York State's established appellate review process with respect to them. *See* Respondent's Memorandum of Law at 2, 7-8.

The Court agrees that Alston has not exhausted grounds two and three and further observes that it would be futile for Alston to return to state court and attempt to exhaust these

claims because he "no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)." *Grey v. Hoke*, 933 F.2d at 120. Two procedural rules in New York operate to create this result. First, New York State law permits only one direct appeal of a conviction to the Appellate Division. *See Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001) (noting that a criminal defendant is "entitled to one (and only one) appeal to the Appellate Division" under N.Y. Court Rules § 500.10(2)).

Although New York's Criminal Procedure Law ("C.P.L.") provides for collateral review of a conviction under Section 440.10, such review is not available if the claim asserted by the defendant could have been raised (or was actually decided) on direct appeal. *See* N.Y. Crim. Proc. Law §§ 440.10(2)(a), (c). Under Section 440.10(2)(c), which is pertinent to Alston's case, a New York State court "*must* deny a motion to vacate" a conviction on a particular issue when "sufficient facts appear on the record of the proceedings underlying the judgment" to have permitted review of the issue on appeal and there was an "unjustifiable failure" to raise the ground on appeal. N.Y. Crim. Proc. Law § 440.10(2)(c) (emphasis supplied). Thus, if the record was sufficient to permit Alston to have raised the claim of trial court error and the claims relating to the weight and sufficiency of the evidence, Alston is foreclosed from raising these claims in a collateral motion by virtue of C.P.L. § 440.10(2)(c). Obviously, the claim of trial court error and the claims relating to the sufficiency and weight of the evidence are contained within, and apparent on the face of, the trial record. If Alston were to attempt to raise them in the context of a C.P.L. § 440.10 motion to vacate, the state court would be required to deny them pursuant to Section 440.10(2)(c).

In a case such as this one, where the petitioner fails to present a claim to each level of the

state courts but is subsequently foreclosed from doing so by a state procedural rule, the

petitioner's claim is "deemed exhausted" for purposes of federal habeas review, and the habeas

court will not direct the petitioner to return to state court in an attempt to exhaust that claim.

*Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997); *accord Aparacio v. Artuz*, 269 F.3d at 90;

*Bossett v. Walker*, 41 F.3d 825, 828-29 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054, 115 S. Ct.

1436, 131 L. Ed.2d 316 (1995); *Grey v. Hoke*, 933 F.2d at 120-21. Of course, "the procedural bar

that gives rise to exhaustion provides an independent and adequate state-law ground for the

conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim,"

*Gray v. Netherland*, 518 U.S. 152, 162, 116 S. Ct. 2074, 135 L. Ed.2d 457 (1996), and the

petitioner may only avoid this result by showing cause for, and prejudice attributable to, the

default, or that a "fundamental miscarriage of justice" would occur if the federal court declines

to consider the federal claim. *Harris v. Reed*, 489 U.S. 255, 262, 109 S. Ct. 1038, 103 L. Ed.2d

308 (1989).

Alston has alleged neither cause for, nor prejudice that would result from the procedural

default occasioned by C.P.L. § 440.10(2)(c).  Indeed, none is apparent on the record before the

Court. Furthermore, Alston has not made the factual showing of "actual innocence" necessary to

warrant the "fundamental miscarriage of justice" exception. Thus, there is no basis for this Court

to excuse the procedural default that gave rise to the "constructive exhaustion" of grounds two

and three, and habeas review of grounds two and three is therefore unavailable.

## "Adequate and Independent" State Ground Doctrine and Procedural Default

Respondent argues that Alston's claims relating to the ineffective assistance of trial

counsel are procedurally defaulted because the state court denied them on the basis of New

York's procedural bar rule, C.P.L. § 440.10(2)(c), when Alston raised them in support of this

Section 440 motion to vacate the judgment. The trial court held as follows:

> [B]ased upon its review of the record and submitted documents, the defendant's
> allegation of ineffective assistance of counsel refers to specific matters appearing
> on the record, and defendant unjustifiably failed to raise this issue on his direct
> appeal. The Court concludes that the defendant's motion must be denied because
> sufficient facts appear on record to have permitted upon appeal, review of the
> issue of ineffective assistance of counsel (*see* CPL 440.10(2)(c)).

It is a well-settled aspect of federal habeas jurisprudence that if "a state prisoner has

defaulted his federal claims in state court pursuant to an independent and adequate state

procedural rule, federal habeas review of the claims is barred" absent (1) a showing of cause for

the default *and* actual prejudice attributable thereto, or (2) a showing that failure to consider the

claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S.

722, 750, 111 S. Ct. 2546, 115 L. Ed.2d 640 (1991).  A state ground will create procedural

default sufficient to bar habeas review if the state ground first was an "independent" basis for the

decision; this means that "the last state court rendering a judgment in the case clearly and

expressly state[d] that its judgment rests on a state procedural bar."  In addition, the state

procedural bar must be "adequate" to support the judgment–that is, it must be based on a rule

that is " 'firmly established and regularly followed' by the state in question." *Garcia v. Lewis*,

188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). Whether

application of the state's procedural rule is "firmly established and regularly followed" must be

judged in the context of "the specific circumstances presented in the case, an inquiry that

includes an evaluation of the asserted state interest in applying the procedural rule in such

circumstances." *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (citing *Lee v. Kemna*, 534

U.S. 362, 386-87 (2002)).

As discussed above, Section 440.10(2)(c) of New York's Criminal Procedure Law mandates that the state court deny any 440.10 motion where the defendant unjustifiably failed to argue such constitutional violation on direct appeal despite a sufficient record. *See Levine v. Commissioner of Correctional Servs.*, 44 F.3d 121, 126 (2d Cir. 1995) (refusing to conduct federal habeas review where New York's appellate court found claim to be procedurally barred under C.P.L. § 440.10(2)(c)); *People v. Santillana*, 145 Misc.2d 567, 547 N.Y.S.2d 981, 982 (Sup. Ct. 1989) (barring claims pursuant to C.P.L. § 440.10(2)(c) that were not raised on direct appeal despite sufficient facts in record to allow defendant to do so).

When a claim, such as ineffective assistance of trial counsel, is based on matters *dehors* the record, New York courts do not require a defendant to raise it on direct appeal; rather, a collateral motion under C.P.L. § 440.10 is the general avenue for pursuing such a claim. *E.g.*, *People v. Harris*, 109 A.D.2d 351, 491 N.Y.S.2d 678, 687 (App. Div. 2d Dept.) (defendant argued that trial counsel gave her faulty legal advice regarding a possible extreme emotional disturbance defense, thus depriving her of effective assistance of counsel in derogation of her constitutional rights; court held that the trial record insufficient to resolve ineffective assistance claim), *appeal denied*, 66 N.Y.2d 919, 498 N.Y.S.2d 1034, 489 N.E.2d 779 (N.Y. 1985). However, where the basis for a claim of ineffective assistance of trial counsel is apparent on the face of the trial record, New York courts have upheld the use of C.P.L. § 440.10(2)(c) to deny such a claim. Thus, the well-settled rule that where the record is sufficient to allow appellate review of a claim, the failure to raise that claim on appeal precludes subsequent collateral review of the claim, applies to bar collateral review where the facts underlying an ineffective assistance claim appear on the record. *See*, *e.g.*, *People v. Cooks*, 67 N.Y.2d 100, 103-04 (N.Y. 1986);

-14-

*People v. Jossiah*, 2 A.D.3d 877, 877 (App. Div. 2d Dept. 2003); *People v. Skinner*, 154 A.D.2d 216, 221 (App. Div. 1st Dept. 1990).

Federal courts in turn have denied habeas review on the basis of similar state court rulings that ineffective assistance claims were procedurally barred by C.P.L. § 440.10(2)(c). *See*, e.g., *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997) (holding that C.P.L. § 440.10(2)(c) was adequate and independent state ground to deny ineffective assistance of trial counsel based on failure to object to jury charge); *Witt v. Walker*, No. 92 CIV. 2085 (MBM), 1993 WL 330503, at *4 (S.D.N.Y. Aug. 19, 1993); *Jones v. Senkowski*, No. 89 CV 1556 (SJ),    1992 WL 373683, at *2 (E.D.N.Y. Nov. 25, 1992); *Jones v. Fischer* No. 05 CV 24(ARR) 2006 WL 2583206, *5 (E.D.N.Y. Sept. 6, 2006) ("Trial counsel plainly failed to move the court to remove the action to Family Court. Although petitioner has argued that this claim "was never part of the original record" and so was only viable on collateral review, petitioner has offered no reason "suggesting that appellate counsel would have needed a new evidentiary hearing to develop this claim."); *Sweet v. Bennett*, 353 F.3d 135, 139-40 (2d Cir. 2003) (noting that N.Y. Criminal Procedure Law § 440.10(2)(c) acts as independent and adequate state ground barring federal habeas review of ineffective assistance of counsel claim where the basis of Sixth Amendment issue involves alleged errors well established in the trial record); *Brooks v. Walker*, Civil No. 9:01-CV-760 (GLS), 2006 WL 1875103, *7 (N.D.N.Y. July 3, 2006) (petitioner alleged that trial counsel rendered ineffective assistance by failing to move to dismiss the Initial Indictment; state court denied such claims pursuant to, *inter alia*, C.P.L. § 440.10(2)(c), because petitioner failed to raise such claims in his direct appeal and did not provide any justification for his failure to assert those claims in his direct appeal; petitioner thereby procedurally defaulted on his federal claims

alleging ineffective assistance of trial counsel).

Here, Alston's claims of ineffective assistance of trial counsel all relate to alleged errors by counsel that are apparent on the face of the record–namely, a failure to make a pre-trial omnibus motion, a failure to question why counts three and five of the indictment were not dismissed, and a failure to object to the jury's verdict. Alston has offered no basis for this Court to find that his claims could not have been presented on direct appeal without the need for a state court evidentiary hearing. Furthermore, Alston had different appellate counsel; he was not represented on appeal by his trial counsel who, understandably, could not be expected to argue his own ineffectiveness. *Cf. Moseley v. Scully*, 908 F. Supp.1120, 1128 (E.D.N.Y.1995) (finding that New York courts had not uniformly applied C.P.L. § 440.10(2)(c)  to cases "where the defendant had the same trial and appellate counsel"). The ineffective assistance of trial counsel claims raised here by Alston appear to be the type of claims in which New York courts routinely apply C.P.L. § 440.10(2)(c) as a basis for dismissal. Thus, the Court concludes that C.P.L. § 440.10(2)(c) was invoked as an adequate and independent state ground, barring further habeas review. This conclusion is consistent with rulings in many federal habeas cases which have held that, where an ineffective assistance of counsel claim is record-based, C.P.L. § 440.10(2)(c) constitutes a procedural rule that is "firmly established and regularly followed" and thus "adequate." *See*, *e.g.*, *Sweet v. Bennett*, 353 F.3d at 139-40; *Lee v. Senkowski*, 2003 WL 22890405, at *9 (S.D.N.Y. Dec. 2, 2003) (Report and Recommendation, adopted April 30, 2004); *Ryan v. Mann*, 73 F. Supp.2d 241, 248 (E.D.N.Y. 1998), *aff'd*, 201 F.3d 432 (2d Cir. 1999).

Neither cause nor prejudice is apparent on the record before the Court, and there has been

no showing of actual innocence. Accordingly, Alston's ineffective assistance of counsel claims

are procedurally defaulted and habeas review of them is precluded.

**Merits of the Petition**

**1.      Double Jeopardy**

On direct appeal, the Appellate Division rejected Alston's Double Jeopardy claim as

follows:

> Contrary to the contention of defendant, the verdict acquitting him of the first
> charged count of rape and finding him guilty of the second charged count of rape
> does not implicate the prohibition against double jeopardy. In his opening
> statement, the prosecutor referred to the sequence in which defendant allegedly
> committed the charged crimes and the victim then testified to the acts in the order
> in which they were charged in the indictment. Thus, there is no danger that
> different jurors convicted defendant based on different alleged acts of rape[.]

*People v. Alston*, 275 A.D.2d at 997, 714 N.Y.S.2d 252 (citations omitted).

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be

subject for the same offence to be twice put in jeopardy of life or limb. . . ." U.S. CONST. amend.

V. This provision "protects against a second prosecution for the same offense after acquittal. It

protects against a second prosecution for the same offense after conviction. And it protects

against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711,

717, 89 S.Ct. 2072, 2076, 23 L. Ed.2d 656 (1969) (footnotes omitted); *accord United States v.

Estrada*, 320 F.3d 173,180 (2d Cir. 2003) (quoting *Sattazahn v. Pennsylvania*, 537 U.S. 101,

106, 123 S.Ct. 732, 154 L. Ed.2d 588 (2003)). The Fifth Amendment's prohibition against

Double Jeopardy has been incorporated into the Fourteenth Amendment's Due Process Clause

and thereby has been made applicable to the states. *Benton v. State of Maryland*, 395 U.S. 784,

794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

### a.   Sufficiency of the Indictment

In this Court's view, the crux of Alston's claim lies within the charging indictment, and the fact that there were several identically worded counts of first degree rape and sodomy therein. The Supreme Court, in *Russell v. United States*, 369 U.S. 749, 82 S. Ct. 1038, 8 L. Ed.2d 240 (1962), set forth the criteria by which the sufficiency of an indictment is to be measured, and directed courts to assess

> first, whether the indictment "contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet,'" and secondly, "'in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.'"

369 U.S. at 763-64; *accord, e.g.*, *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000); *Valentine v. Konteh*, 395 F.3d 626 (6th Cir. 2005). Thus, an indictment is only sufficient if it (1) contains the elements of the charged offense, (2) gives the defendant adequate notice of the charges, and (3) protects the defendant against double jeopardy. *Hamling v. United States*, 418 U.S. 87, 117, 94 S. Ct. 2887, 41 L. Ed.2d 590 (1974) ("[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.") (cited in *Pirro*, 212 F.3d at 92); *accord Valentine*, 395 F.3d at 631; *see also United States v. Cruikshank*, 92 U.S. 542, 448, 23 L. Ed. 588 (1875). The due process rights enunciated by the Supreme Court in, for example, *Russell*, are required in federal as well as state criminal indictments. *E.g.*, *De Vonish v. Keane*, 19 F.3d 107, 108 (2d Cir. 1994); *Valentine*, 395 F.3d at 631.

### b.   Adequate Notice

-18-

The indictment returned by the grand jury in Alston's case complied with the first prong of *Russell* by adequately setting out the elements of the charged offenses of first degree burglary, first degree rape, and sodomy. The issue is whether the multiple, undifferentiated charges of first degree rape and sodomy violated Alston's right to adequate notice of the charges against him and his right to be protected from Double Jeopardy. *E.g.*, *Valentine*, 395 F.3d at 630.

As the Supreme Court explained in *Russell*, an indictment must give a defendant adequate notice of the charges against him so that he is able to mount an effective defense. 369 U.S. at 763-64. *See also Cole v. Arkansas*, 333 U.S. 196, 68 S. Ct. 514, 92 L. Ed. 644 (1948) ("No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by the charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal."); *Jackson v. Virginia*, 443 U.S. 307, 314, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979) ("[A] conviction upon a charge not made . . . constitutes a denial of due process."). The Supreme Court reiterated in *Russell* that "[i]t is an elementary principle of criminal pleading, that where the definition of an offence, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,–it must descend to particulars.'" 369 U.S. at 764 (quoting *Cruikshank*, 92 U.S. at 558); *see also id.* (citing *United States v. Carll*, 105 U.S. 611, 612, 26 L. Ed. 1135 ("In an indictment upon a statute, it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished. . . .")). The language of the statute "'[u]ndoubtedly'" "'may be

used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.'" *Id.* (quoting *United States v. Hess*, 124 U.S. 483, 487, 8 S. Ct. 571, 573, 31 L. Ed. 516 (1888)).

Alston complains in particular about the lack of differentiation among the six counts of the indictment charging him with various sexual offenses. To recapitulate, counts three, five, and seven charged Alston with first degree rape (sexual intercourse by forcible compulsion). These counts all stated that "defendant, on or about December 12, 1997, in the County of Monroe, State of New York, engaged in sexual intercourse with Cassandra Lee Dean, by forcible compulsion." Indictment No. 6457/98, Resp't App. E. at 47-48. These counts set forth the date and time of the alleged incidents. As to the underlying "theory" of these counts, the Court notes that "[s]exual intercourse" is defined in the Penal Law as follows: "'Sexual intercourse' has its ordinary meaning and occurs upon any penetration." N.Y. Penal Law § 130.00(1). Section 130.00 goes on to define "oral sexual conduct" and "anal sexual conduct," and thus "sexual intercourse" for purposes of Section 130.35(1) obviously refers to vaginal intercourse. The indictment sets forth all of the substantive elements of the crime of first degree rape by forcible compulsion. However, the problem, according to Alston, is that although it identifies the date and place of the alleged crimes, it fails to differentiate any further between each count of rape.

Counts two, four, and six charged Alston with sodomy pursuant to New York Penal Law § 130.50. Count two charged that "defendant, on or about December 12, 1997, . . . engaged in deviate sexual intercourse with Cassandra Lee Dean, to whom he was not married, by forcible compulsion, to wit: contact between the mouth and the penis by forcible compulsion."

-20-

Indictment No. 6457/98, Resp't App. E. at 47. By contrast, counts four and six charged sodomy under a different theory: "[D]efendant, on or about December 12, 1997, . . . engaged in deviate sexual intercourse with Cassandra Lee Dean, to whom he was not married, by forcible compulsion, to wit: contact between the penis and the anus by forcible compulsion." Indictment No. 6457/98, Resp't App. E. at 47-48. Count two does not present a due process problem because it was based upon a different sexual act (*i.e.*, oral sexual conduct) than that the one forming the basis for counts four and six (*i.e.*, anal intercourse). This difference was apparent on the face of the indictment.

In light of the foregoing, it appears to this Court that any potential due process problem would be found in the undifferentiated counts of first degree rape (three, five, and seven) and the undifferentiated counts of anal sodomy (four and six) because there are multiple counts of each offense. *See Valentine v. Konteh*, *supra*. However, count six (anal sodomy) and count seven (rape) were dismissed at the close of the proofs because the prosecution had failed to offer any testimony as to them. Only counts one through five were submitted to the jury. Thus, the jury was only presented with two undifferentiated counts of first degree rape (counts three and five). There was no due process problem remaining with respect to the sodomy counts, since the jury was only presented with one count of anal sodomy and one count of oral sodomy. The potential due process problem appears to be confined to counts three and five.

A discussion of *Valentine v. Konteh* in some detail is in order here, as the petitioner in that case alleged, similarly to Alston here, a due process violation related to the lack of differentiation among counts in the indictment. Petitioner Valentine was prosecuted, tried, and convicted for sexually abusing his eight-year-old stepdaughter. The grand jury returned an

indictment charging Valentine with twenty counts of child rape and twenty counts of felonious

sexual penetration of a minor. *Valentine*, 395 F.3d at 629. According to the indictment, all forty

offenses occurred between March 1, 1995, and January 16, 1996. *Id.* Each rape count alleged

that Valentine "unlawfully engaged in sexual conduct with [the stepdaughter] not his spouse by

purposely compelling her to submit by the use of force or threat of force, [the stepdaughter]

being under the age of 13 years, to-wit: d.o.b. 11-18-87." *Id.* No further information was

included to differentiate one count of child rape from another. *Id.*

Likewise, each count of felonious sexual penetration was identical, alleging that

Valentine "unlawfully without privilege to do so inserted a part of the body, an instrument,

apparatus or other object to-wit: finger, into the vaginal or anal cavity of another, to-wit: [the

stepdaughter] not the spouse of the offender and who was under the age of 13 years . . . by

purposely compelling her to submit by force or threat of force." *Id.* The bill of particulars did not

offer further differentiation among the counts.

The district court in *Valentine* granted the petitioner a writ of habeas corpus on the

ground that the indictment violated the prohibition against Double Jeopardy. The district court

did not decide the issue of whether the indictment provided the petitioner with adequate notice of

the charges against him, but expressed doubt as to whether the indictment sufficiently apprised

him of what the defense must have been prepared to meet at trial. *See* 395 F.3d at 632 (citing

*Valentine v. Huffman*, 285 F. Supp.2d at 1024 (quoting *Russell*, 369 U.S. at 763-64) (quotation

marks omitted)).

On appeal, the Sixth Circuit first confronted the issue of adequate notice, observing that

the problem in Valentine's case was "not the fact that the prosecution did not provide the

defendant with exact times and places." *Valentine*, 395 F.3d at 632. Had there been singular counts of each offense, "the lack of particularity would not have presented the same problem." *Id.* Rather, the Sixth Circuit stated, "the problem [was] that within each set of 20 counts, there [were] absolutely no distinctions made." *Id.* Thus, the petitioner was prosecuted for "two criminal acts that occurred twenty times each, rather than for forty separate criminal acts." *Id.* The court went on to criticize the prosecution for failing to "attempt to lay out the factual bases of forty separate incidents that took place," and found that because "the forty criminal counts were not anchored to forty distinguishable criminal offenses, Valentine had little ability to defend himself." *Id.* at 633.

Without explicitly stating that actual notice to a defendant of the criminal charges against him can suffice to satisfy due process notice requirements even if the indictment is defective, the Sixth Circuit in *Valentine* proceeded to analyze whether the petitioner had received "actual notice" of the charges against him. The Sixth Circuit contrasted the facts of *Valentine* with those of *Parks v. Hargett*, No. 98-7068, 1999 WL 157431 (10ᵗʰ Cir. Mar. 23, 1999), in which the Tenth Circuit "indicated that the charging information alone did not have the requisite specificity." 395 F.3d at 633 (citing *Parks*, 1999 WL 157431) (charging information set forth multiple identically worded counts of sexual abuse of an unnamed minor over a seventeen-month-period). However, in *Parks*, the court "did not reach the issue [of specificity] as it determined that the defendant had adequate actual notice of the charges against him," because at a pre-trial hearing, defendant "'received actual notice of the name and identity of the six-year old child and the fact that he was charged with three separate incidents of molestation, one alleged to have occurred in his bedroom, another in his hot tub, and a third in the bathroom of his home.'" *Id.* (quoting *Parks*,

1999 WL 157431 at *3). With this specific information, the Tenth Circuit concluded, the

defendant had "'actual notice of sufficiently specific facts to respond to the charges and prepare

an adequate defense.'"[7]

  In *Valentine*, by contrast, the Sixth Circuit found that neither the indictment, nor the bill

of particulars, nor the evidence at trial apprised the petitioner of what occurrences formed the

bases of the criminal charges he faced. *Id.* at 634, 633 (noting that at trial, the victim "described

the 'typical' abusive behavior by Valentine and then testified that the 'typical' abuse occurred

about twenty or fifteen times"). Thus, Valentine was "prosecuted and convicted for a generic

pattern of abuse rather than for forty separate abusive incidents." *Id.* at 634. The Sixth Circuit

observed that the due process infirmities present in Valentine's indictment "might have been

cured had the trial court insisted that the prosecution delineate the factual basis for the forty

---

[7]  Other federal courts have held that deficient indictments were held not to violate the Sixth and Fourteenth Amendments where the defendant received actual notice of the charges against him. *E.g.*, *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999) ("While a bill of particulars or discovery cannot save a 'defective indictment,' [*United States v.*] *Panzavecchia*, 421 F.2d [440,] 442 [(5th Cir. 1970)], where the indictment has been found even minimally sufficient, a court may look to the record as a whole in determining whether the defendant is protected from double jeopardy in a subsequent prosecution and whether the defendant has had an adequate opportunity to prepare his defense.") (citing *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992); *United States v. Sperling*, 506 F.2d 1323, 1344 (2d Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975)); *see also Hartman v. Lee*, 283 F.3d 190, 196 n.5 (4th Cir. 2002) (citing *Stephens v. Borg*, 59 F.3d 932, 934-36 (9th Cir. 1995) (holding that failure of indictment to charge felony murder did not violate Constitution when defendant "had five days of actual notice of the prosecution's intent to rely on a felony-murder theory" prior to closing argument); *Wilson v. Lindler*, 995 F.2d 1256, 1264 (4th Cir. 1993) (concluding that constructive amendment of indictment did not violate habeas petitioner's Sixth Amendment right when he received actual notice of prosecution's theory of case "at least before the jury was sworn, and almost certainly weeks before"); *Hulstine v. Morris*, 819 F.2d 861, 863-64 (8th Cir. 1987) (holding that "[d]ue process requirements may be satisfied if a defendant receives actual notice of the charges against him, even if the indictment or information is deficient"; concluding that defective indictment did not violate defendant's Sixth Amendment right because defendant was made fully aware of charges and potential punishment during guilty plea proceedings); *Fawcett v. Bablitch*, 962 F.2d 617, 618 (7th Cir. 1992) (concluding that defective state charging document does not violate due process unless "inadequate notice [leads] to a trial with an unacceptable risk of convicting the innocent")); *see also, e.g., Chandler v. Moscicki*, 253 F. Supp.2d 478, 486-87 (W.D.N.Y. 2003) (citing *Hulstine* with approval); *United States v. Pfeifer*, 371 F.3d 430, 438 (8th Cir. 2004) (citing *Hulstine* with approval); *United States v. Odom*, 252 F.3d 1289, 1298 (11th Cir. 2001) ("Even an inadequate indictment satisfies due process if the defendant has actual notice, so that she suffers no prejudice.") (citing *United States v. Becton*, 751 F.2d 250, 257 (7th Cir. 1984)).

separate incidents either before or during the trial." *Id.* However, this was not done. Thus, although Valentine had "legal and actual notice that he must defendant against the child's allegations of sexual abuse over a ten-month period, he was given no notice of the multiple incidents for which he was tried and convicted." *Id.*

The Court concludes that unlike the petitioner in *Valentine*, here Alston did have actual notice of the charges against him. Although it is not clear as to whether there was a bill of particulars in this case, prior to trial, Alston received a copy of the victim's statement to the police, in which she stated as follows:

> Once we were in the bedroom, he slammed my face onto the floor causing me to strike a floor heater vent, busting my lip. As he was dragging me in the room, he said, "I'm going to get that pussy." He then pulled my pants down to my ankles. He took his penis out of his pants and put it my mouth. He then kissed me on the lips after that, I remember this because he spit [sic] my blood from my busted lip on the floor. He then put his penis in my vagina. He then put his penis in my rectum, and would turn me back and forth my sided putting his penis in my vagina and in my rectum. I think he ejaculated while his penis was inside my vagina.

Resp't Ex. E at 50-51.  By means of the victim's statement, Alston had notice prior to trial that he was accused of one instance of oral sodomy, followed by at least one count of rape (forcible vaginal intercourse), followed by at least one count of anal sodomy. Thus, the statement gave notice as to the particulars of count two (oral sodomy), count three (rape), and count four (anal sodomy). The statement also put Alston on notice that there were additional acts of anal sodomy and rape: the victim described that after the first act of anal sodomy, Alston alternated between raping her and anally sodomizing her.  Although the statement is not clear as to how many times this occurred, at trial, the victim testified that after the first act of anal sodomy, Alston raped her again and then ejaculated in her vagina, completing the sexual assault. That alleged rape, in

which Alston allegedly ejaculated, corresponded to count five. In addition, the prosecutor

chronologically set forth the alternating pattern of alleged rapes and acts of anal sodomy in his

opening statement. Thus, unlike the prosecutor in *Valentine*, the prosecutor in Alston's case

delineated the factual bases for the separate incidents during trial. The Court finds, therefore, that

Alston had actual notice of the multiple incidents for which he was tried and convicted, and that

he was not prejudiced by any defects in the indictment caused by the lack of differentiation.

> ### c.    Double Jeopardy

The Court turns next to the question of whether the indictment presented Alston with a

Double Jeopardy problem. In *Russell*, the Supreme Court found that indictments are only

constitutionally sufficient if "the record shows with accuracy to what extent he may plead a

former acquittal or conviction" in proceedings taken against him for a similar offense. 369 U.S.

at 764; *accord Valentine*, 395 F.3d at 635. The defendants in *Russell* were being tried for their

failure to answer questions before a congressional subcommittee. They claimed that their

indictments subjected them to the danger of Double Jeopardy. The Supreme Court ruled that the

charging information was specific enough to protect the defendants from that risk:

> Since the indictments set out not only the times and places of the hearings at
> which petitioners refused to testify, but also specified the precise questions which
> they then and there refused to answer, it can hardly be doubted that the petitioners
> would be fully protected from again being put in jeopardy for the same offense,
> *particularly when it is remembered that they could rely upon other parts of the
> present record* in the event that future proceedings should be taken against them.

*Id.* (emphasis supplied) (citing *Bartell v. United States*, 227 U.S. 427, 433, 33 S. Ct. 383 (1913)

("As to the objection that the charge was so indefinite that the accused could not  plead the

record and conviction in bar of another prosecution, it is sufficient to say that in such cases it is

the right of the accused to resort to parol testimony to show the subject-matter of the former

conviction, and such practice is not infrequently necessary.") (citation omitted)).

Here, as discussed above, the charges in the indictment were linked to differentiated incidents through the victim's statement to the police and through her testimony at trial. To review, the Court notes that five counts were submitted to the jury: count one (burglary); count two (oral sodomy); count three (rape); count four (anal sodomy); and count five (rape). The proof presented at trial linked count two to Alston's placing his penis in the victim's mouth, which was the first act in the series of sexual assaults described by the victim. Count three was linked to the first rape, *i.e.*, Alston's initial penetration of the victim's vagina which occurred after he had forced her to orally sodomize him. Count four referred to his penetration of the victim's anus, which followed the first act of rape. Count five was linked to the final act of rape, in which Alston allegedly ejaculated into the victim's vagina; that occurred after Alston had removed his penis from her anus. The jury returned a verdict acquitting Alston of counts one through four and convicting him of count five (rape).

Because the two charges of rape were linked to differentiated incidents, there was not resulting uncertainty as to what the trial jury actually found. An illustrative comparison is *Valentine*, in which the state court of appeals ruled that there was no evidentiary basis for five of the twenty felonious sexual penetration, a ruling which essentially acknowledged that the petitioner was "over-convicted." The Court observes that this was not a case in which Alston was "over-convicted;" based on the testimony presented at trial, there was an evidentiary basis for submitting the two counts of first degree rape to the jury. The victim described two acts of rape; in the second act of rape (which corresponded to count five), it was alleged that Alston ejaculated. The Court notes that the vaginal slides prepared in connection with the rape kit

showed that sperm was present in the victim's vagina.

*Isaac v. Grider*, No. 98-6376, 211 F.3d 1269, 2000 WL 571959, at *5 (6th Cir. May 4, 2000), which the Sixth Circuit discussed in *Valentine*, also demonstrates the type of uncertainty that gives rise to a Double Jeopardy problem. In *Isaac*, the petitioner was tried on a seventeen-count indictment; ten of those counts dealt with the sexual abuse of one boy ("J.J."), and there were five identical counts of second degree sodomy and five identical counts of second degree sexual abuse. Before instructing the jury, the trial court entered a judgment of acquittal on four of the original seventeen counts, leaving thirteen counts for the jury. However, neither party was able to provide the circuit court with any oral or written order in the record identifying the counts on which the trial court directed a verdict. Nor was the Sixth Circuit able to locate such an order in the record, apart from the trial court's statement following J.J.'s testimony that it would instruct the jury on incidents relating to only three weekends involving J.J. After reconstructing the events based on its comparison of the 17 counts which were viable at the time of trial to the 13 jury instructions relating to the charges, the Sixth Circuit found that the trial court instructed the jury on three of the five duplicate second degree sodomy counts relating to J.J., and three of the five duplicate second degree sexual abuse counts relating to J.J. Thus, the trial court apparently dismissed four of the duplicate counts relating to J.J. before submitting the case to the jury.

The Sixth Circuit in *Isaac* held that while the indictment was not a model of clarity, it did provide the petitioner with adequate notice of the charges against him since it was clear in light of the bill of particulars that each duplicate charge in the indictment related to a separate incident involving the victim J.J., and that all of the incidents occurred within the same time period.

-28-

However, the Sixth Circuit found, the "identical charges introduced the risk of double jeopardy and, indeed, may have already resulted in double jeopardy *in this prosecution* given the unique facts of this case." *Isaac*, 2000 WL 571959, at *5 (emphasis in original). The Sixth Circuit observed that the trial court apparently acquitted the petitioner on four of the duplicate charges relating to J.J. before the case was submitted to the jury. However, the trial court submitted the six remaining duplicate charges to the jury, and the jury entered guilty verdicts on all of those charges.

Apparently, the jury instructions did not advise the jury as to the court's directed verdicts, nor did the instructions limit the jury's consideration of the evidence relating to J.J. This was important–the trial court instructed the jury on three counts of sodomy and three counts of sexual abuse, but the record revealed that there was at least some evidence of *eight to nine* incidents of sodomy and *five* incidents of sexual abuse relating to J.J. The Sixth Circuit found that the trial proof thus could not be reconciled with the court's instructions on three counts of sodomy and three counts of sexual abuse and, therefore, it was "possible that the jury convicted the petitioner of conduct for which the trial court directed an acquittal." *Id.*

In Alston's case, the trial court dismissed counts six and seven "as a trial order of dismissal at the request of the defense" since there had been no proof at all offered by the prosecution as to those counts.  T.514. This occurred on the record but out of the presence of the jury. The trial judge informed the attorneys that he would revise the jury verdict sheet and clearly stated that the indictment was not going into the jury room. T.521 ("I have a special charge on that, they are not to get their evidence from the indictment, but from the evidence which was produced at trial."). Defense counsel expressed a concern that during the

prosecution's opening statement, "they referred to Counts Six and Seven." *Id.* The trial court

stated that it would "tell [the jury] in advance they are going to be given five counts to consider"

and that it would tell them what those counts were before the attorneys gave their closing

statements. The trial court stated that it would not inform the jury that it had dismissed the sixth

and seventh counts of the indictment, and that defense counsel was precluded from mentioning

in his summation that those counts were dismissed. The trial court ultimately charged the jury on

counts one through five of the indictment.

During their deliberations, the jury sent out the following note: "[P]lease clarify and

provide Charges Three and Five with regard to distinguishing the difference between the two

charges." T.632.  In response to that request, the trial court informed the jury as follows:

> I am not going to provide charges Three and Five, but I can clarify it by saying
> Three and Five are both charges of Rape. It's alleged that there was [*sic*] two
> occasions in which there was an engagement in sexual intercourse by forcible
> compulsion, two separate occasions, both at the same date, both in the same place.
> As you recall, the charges were Burglary, that's one count of Burglary, then there
> was a charge of Sodomy, that's one charge of sodomy, then there was a charge of
> Rape, and then there was a charge of a separate Sodomy, and then there was a
> charge of another count or Rape. . . .

T.635.  As discussed above, the jury returned a verdict acquitting Alston of count three and

convicting him of count five.

Alston's case is distinguishable from *Isaac v. Grider* in that the jury in this case did not

hear any testimony at all regarding counts six and seven; in *Isaac*, the jury had heard testimony

as to the entire seventeen-count indictment. The victim in Alston's case described two incidents

of rape, separated by an act of anal sodomy; the jury was given only two charges of rape on

which to deliberate. Thus, this was not akin to the situation in *Isaac* where there was "extra"

proof as compared to number of charges submitted to the jury. Here, the proof that the jury heard

regarding the two alleged rapes can be reconciled with the trial court's jury instructions and its explanation, during deliberations, regarding how to differentiate between those two counts.

As discussed above, the two counts of rape presented to the jury were linked to differentiated incidents by the victim's testimony and by the trial court's instructions to the jury. The proof at trial and the jury instructions informed the jury which factual incidents were connected to which charges. Thus, it was not possible that the jury convicted him on the count of first degree rape without jury unanimity as to the underlying factual offense. For the foregoing reasons, and based upon the circumstances of this case, the Court finds that Alston was not deprived of the Fifth Amendment's protection against Double Jeopardy. The Appellate Division's affirmance of Alston's conviction on one count of first degree rape was neither an incorrect, nor an unreasonable application of clearly established Supreme Court double jeopardy jurisprudence.

## CONCLUSION

For the foregoing reasons, petitioner Bernard Alston's request for a writ of habeas corpus is denied and the petition is dismissed. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1); *United States v. Lozada*, 107 F.3d 1011, 1013 (2d Cir.1997) (holding that, under 28 U.S.C. § 2253(c)(1), certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right).

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
   VICTOR E. BIANCHINI
   United States Magistrate Judge

DATED:        November 21, 2006
             Rochester, New York.

-31-